Good morning. May it please the Court. The first thing I'd like to start off with is that violation of the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. Section 3801, that that alone may be a basis for a federal civil rights action. And that the trial court for some reason just didn't talk about it. We raised it in our summary judgment opposition. Counsel has indicated it's not properly raised in a complaint. Now, I don't know what the trial judge thought about it because there's no decision on it. But what I'd like to say is that the complaint filed by Mr. Salem does say a lot of factual detail at page 6, paragraphs 23-24, about how the correctional manager is there, mainly Valerie Hicks is the main person that was involved in this, made his attempt to get military leave extremely difficult by doing something called holding him over. Now, holding over means you work another eight-hour shift. So you've worked one eight-hour and you work another one. It just happened that that consistently occurred on an evening just before he had to go. But you could still go. You work until midnight. You've got to drive four hours. So wake up at 4 a.m. and drive all the way to the Air Force Base. No problem, right? Well, the fact is, and he did do that. He did work until late at night and get up in the morning and drive all that. But it interfered with his day down there. I mean, he's an emergency medical tech airborne. I think we want those people awake. We'll go there. No. No. By the way, he's here today. He's still here. But he's got he sort of a postscript to this. He's suffered a disability issue with his back so he can no longer be a nurse and which relates in a way to this case. But I'll tell you how later. Just a second. The point is, in the complaint, he says that Ms. Hicks refused to release plaintiff as she was out that act, but referred to it as an act of Congress. We have now spelled it out and we would submit that under the notice pleading requirements of the federal rules that the facts are alleged in detail. There's no mistake about that. The law was not, although it is referred to as an act of Congress. In the summary judgment proceedings, we most certainly raised it and articulated the act, et cetera. The trial court didn't rule on it. Now in this area, I want to point out that the declaration of Valerie Hicks seems to be a full admission of a violation of the act. In it, she says, we made a new change of rule. By the way, counsel objects to the use of the word rule. Whatever it is, here's what happened. Before you got to do your military leave upon you give them verbal, I got to go, and they go, and when you get back, you deliver post orders. The military, for purposes of privacy, they don't fax you these things beforehand. You go to the plane, you fly on the plane, you do all your medical work, you get back. At the end of the day, they give you your post order. He comes back and he gives it to Ms. Hicks. Suddenly, after the, within about a month after the Cal OSHA citation issue came up, they make a new rule. You got to have post orders up front. Now here's something I think it's important is that just the fact that that happens right after the citation we submit is a nexus with the citation issue, the Cal OSHA citation. But our other argument is we actually don't totally need to prove that. If we prove that they violated his rights to go on military leave, that's all we got to show. We went right there. And if you take a look at the declaration of Valerie Hicks, paragraph four or five, and then thereafter, she discusses this new rule. An important omission in that. There is no new document, policy, statement of operation, or other document to support that. She says, she calls a supervisor, she gets a verbal new rule kind of thing. Oh, you got to get the post orders up front. And she says, hey, I'm just following that rule. I think what's important to note is that the, and I don't know if you have it here, but in the district court law library, they have the correctional, I think it's called the DOM, department operations manual. I think it's about 12 volumes. I don't want to misquote it, but it's a big thing. They have a rule on literally everything in the CDC. And the idea that they would make a change as something so dramatic as federal military leave and do that without a writing is quite, to me it does two things. Number one, it shows that their pretextual arguments are really, they're just incorrect. That they're, I hate to say it this way, but they're just lies. We impeach it that way. We say, no way is that true. So in the cases we cite, talk about an absence of documentation as proof that something has gone awry. And I think that really has actually made it to all of your military leave. And we didn't dock you for pay or anything. So what's the beef? And the beef is they interfered with it. Now the good news is he went to Senator Dianne Feinstein. She contacted the prison. She contacted Department of Labor, the secretary. They got involved. And the good news, without a lawsuit or anything, they wrote a couple very clearly stated letters and this whole thing got corrected. So he didn't need to sue anymore in order to enforce that right. It was kind of one without a court battle. You'll be happy to know sometimes things get resolved without the courts. But that violation had still occurred. And the downfall of that still kind of continued. They're still making him hold over up to, I think, the very end. And basically make him drive in a very sleepy way all the way to the Air Force base, get on a plane, conduct his military medical tech assignments while tired and come back. And I think this law, one of the things that this court can do... I'm sorry. Can I interrupt you for just a minute? I see very clearly in your brief that you've alleged that this treatment with respect to his military leave is put forward as retaliation. Have you separately argued a cause of action in your brief? Yes. And I have done that in my brief. And by the way, it's one of my frustrations, I'll point you right to it, was that the trial court ignored it. And I'm glad you're asking because I hope you won't. Just a minute, I'll find it right for you. It's my argument B, and it starts at page 35. And I really try to lay it out there. The heading is, the facts and circumstances presented by Robert Salem create a tribal issue of fact on violation of the Uniformed Services Employment and Reemployment Rights Act. And it goes on. First, it cites Boxall v. Sequoia Union, a Northern District case that says the Civil Rights Act actually covers more than constitutional violations. A lot of people think it's only that. And was the violation of this act pled in your complaint? Yes, although they say no. And that's why I was referring to the complaint. What the complaint says is on page 6... Hang on. Where do I look? Okay, you've got the right... I have the complaint in front of me. Okay, the complaint's the first item, and it should be on page 6 of the complaint. Okay. And it's on line 1 to 2 of that complaint. It says, as she was required to do by act of Congress. Shortly before... Okay. Anyway, what I see there, though, they didn't spell out like the citation of it. And they did spell out the facts. The facts about this whole problem are very much there. They were also testified at length during his deposition, which is part of the record. And he also describes them at length in his declaration. So this whole problem, I think, is very much in the record. What was missing is the actual citation of that statute. And it's a question of whether in the notice pleading that you would permit a little liberal reading of it to allow for that, especially when something is as important as this federal right of military leave. I'll let you do your own de novo review of that issue. I just hope that it gets reviewed this time, because last time, she certainly opposed it, but the trial court just did nothing on it. Now, let me now go to my next issue. And the reason I like that first issue better is I don't have to show a nexus between that violation and the Cal OSHA problem. If I just show a violation of that, that's it. We win. We should go forward. This matter should be reversed. And we submit that the declaration of Valerie Hicks, where they admit this new change in a rule that happens just after the Cal OSHA citation, that that is good proof of a nexus. It may not be proof positive. It may not button it up altogether. But it is something we can show to a jury, and that a jury could infer, well, look at that. After he gets a Cal OSHA citation given to the warden, a little bit later, they get a new rule about military leave. They make it very hard for him to take military leave. And ultimately, he has to get a bunch of people involved. And finally, they back off and fix it. But they would like to say that the military leave change had nothing to do with that Cal OSHA citation. We just, we cited several cases, including the city of, or was it Fuller v. City of Oakland, where, you know, of course the defendants are allowed to put up whatever defense or pretextual argument they have. It's our job to come forward with evidence showing that the pretextual arguments are impeachable, are untrue, or I think we sort of skip around it, but really are just lies. I think that's ultimately what our job is to do. And we submitted all this evidence of all this kind of parade of horribles that happened to Mr. Salem after he got that Cal OSHA citation. And mind you, it was going on even before that. Mr. Salem, you know, he was pricked three times by needles, carrying them out to inmates to give them insulin or what have you. So, of course, he has a very personal desire here. And it's something that the Attorney General's Office has seized upon. Gee, this is a personal case. It's not about a public issue of First Amendment proportion. But let me submit for your review that if he raises an issue that has to do with blood-borne pathogens, and we're talking about AIDS, hepatitis, and all the other blood-borne diseases that inmates can have, and the transferring of that from an inmate to either an inmate or to do the injection, if we're talking about rules that deal with that issue, that is most certainly an issue of public concern. And I can't imagine any argument that says, oh, that's just his private issue. Cal OSHA made a bunch of rules about it. They just violated it flagrantly, amazingly. He raised a union grievance about it. And we're not suing anybody on the union grievance. What we're saying is he has a right to make a grievance. They don't have to, you know, raise it. And I gather your argument is that the OSHA complaint is free, protected speech in the workplace under Pickering, and that the adverse actions taken against him following are 1983 actionable adverse actions within the meaning of 1983 and freedom of speech. That's the argument. Absolutely. And what the trial court said, the trial court didn't rule that it was not a public issue. The trial court did not rule that there was no First Amendment speech. Instead, it went right to the issue of nexus and said, OK, you did your free speech over here and then you had all these bad things happen to you, but you haven't shown the connection between the two. And in order for the trial court to be sustained, we have to agree with the trial court that as a matter of law, the inference simply wasn't there. Yes. And I think that a reasonable jury could have found based on these facts that there was a retaliatory motive. Then then you've got a cause of action. Yes. And the question is, did we create something? You know, they didn't confess to it. So it's absent confession, although you'll note in our record there is what I'd like to call a mini confession. One person, Barbara Walter, says something to the effect. Watch your back. They're out to get you kind of. Now, it's not a total confession of the other defendants, but anyway, it's the idea that, you know, they're out to get you here. And what's the time frame from the time of the OSHA complaint to the time of the ad that the adverse actions begin? Well, first of all, it was going on even before that, because it was going on before. That's obviously not in response to OSHA. It was response to his going to a union grievance to first see first. He wanted to do the issue kind of in-house. And he went there. And after he went to the union grievance, he upset enough people that the negative action started to be taken. Then he goes outside contending that going to the union is also protected free speech under Pickering. Yes. Going to the union and accessing the grievance procedure. It also is a we also plead it not only as a First Amendment issue, but a right of association issue union. So we we have those two theories. But either way, it's the same concept that he can go there and raise a beef. And if he wins or loses fine, but you can't retaliate against him for having gone there. Now, the retaliation then started there, but it was sort of in a smaller way. There were post reassignments where you got to drive all over creation and, you know, just little things, nothing that he would file a lawsuit over, but things that, you know, bothered him. But he just sort of kept it within. But once that December ninety nine is the date Cal OSHA citation. Once that came in and you have to imagine this, he was in the room with the warden and the Cal OSHA people when that was actually handed to the warden and the warden was upset about it. They don't like to have a government agency tell them they're violating the law. That's not what prison wardens like to hear at all. And they got mad. And within a month, we have all this stuff going on with the military leave and it just military leave stuff had not been happening before the right. This new policy. Yes. Let me answer your question. It had not been happening before. And Valerie Hicks, who is the correctional officer, one of the defendants in here states in her declaration what happened there. And it's that paragraphs four and five of her declaration. She says she made a call and one of her superiors said a new rule, not a new rule, but, you know, for now on, you need post orders up front. Okay. And in addition to the military leave, what else happened that was adverse and retaliatory in your view? And by the way, I have a list of these that in our brief and I'll be happy to just recite them. They actually, if you want to. Page 15, 16, 17, 18 of my opening brief that lays all these out. But let me just give you a quick summary of them. The next item we have is reassignment of him to third watch RDO. And this is where he's got to go all over the place. It's an inconvenience because you go to different prisons. They're allowed to do that, but they happen to just do it right after this event. They initiated a completely fabricated charge of sexual harassment against him. The defendants claim, by the way, that that harassment claim never happened. And again, this is where absence of documentation becomes an issue. They have no record of any kind of sexual harassment claim having ever been made against Mr. Salem. Oddly, he's in a position now of trying to say, yes, you really did make one, which may seem backwards. But the point is, is that they came up with this kind of nonsense event. There were two internal affairs officers assigned to it and there were some, there were some actual interviews done. And the fact is, there was, during that period, they say, well, if you have a proceeding coming against you and it doesn't result in anything, there's no adverse employment action. That's kind of their argument to that. And I interrupt you for just a second. You said you wanted to save five minutes. You're under three minutes now for your rebuttal. I know hard questions have taken you in that I have a citation from the brief. That's fine. But you're in well into your rebuttal time. Let me save my rebuttal. I just point out the pages there that we list them all. It's 15 through 17. And the cases we talk about get into a reasonable inference from those facts. Thank you. Thank you. You have about two and a half minutes. Ms. Lutterbeck. Good morning. Good morning. I represent six of the 10 named individual defendants in this case. I encourage the court to look at the case for what it is. It is an attempt by an employee plaintiff to paint with a broad brush all his discontent with his employer. And in order to determine whether this case is valid, one must take a careful examination of the facts brought forth by the individual defendants and the lack of facts brought forth by the plaintiff. I thought this was a case brought under 1983. There was no citation, indeed, of the USERRA in the plaintiff's complaint. Furthermore, the elements of a USERRA claim are not alleged in the complaint. USERRA is an act designed to prevent discrimination in the form of terminating or refusing to rehire military members who have done their duty for this country. That isn't this case. The USERRA doesn't protect military members who, because they have commitments with their employer, are forced to work four hours overtime on a day in which they also have to pack, travel, and rest before their military duty. If that were the standard, I'm not sure how that act would function under the real world of military needs. Your opponent claims that what happened was that magically and mysteriously he would be asked to work extra hours and additional shifts, and this would always come right before he had to exercise his military duty, I guess weekend military duty, that this was done deliberately and knowingly by your clients. What's your response? My response is that the facts simply do not bear out that characterization. Isn't that a tribal issue? It isn't because no evidence was really put forth. There are concessions in the plaintiff's deposition that there was only one day he was not allowed to go to his military duty, and there was only one day where he had to work an abbreviated overtime. Normally, he would have had to work eight hours overtime on that day, but his supervisor accommodated him and cut it to four on this. As I understand that aspect of the claim, it is that your clients deliberately added extra work when they knew he was about to go on military leave and not otherwise. Now, what do the facts show on that? The facts show that this is a prison that is highly understaffed and that overtime was the work of the day, and that Mr. Salem wasn't treated any differently from the other MTAs. There was a list under the contract, the union collective bargaining agreement, under which people were contacted and ordered a list, and that list was followed. There's no evidence of the contrary. What period of time are we talking? Are we talking about a year, two years? I am glad you asked, because all of this supposed interference with military duty occurred in March and April of 1988. The OSHA citation was in December of 1999. So we're talking the military leave aspects of the claim focus on two months? Correct. How many times did he go on military leave during those two months? I believe four or five, four times, I believe. And how many times of those four or five times, how many times was he asked to work overtime immediately prior to taking the leave? In the record, there is a single time. It happened once? Yes. And how many times was he asked to work overtime during that period when it did not involve military leave? That I don't know. Is that in the record? No, I don't believe it is. Okay. And with respect to the characterization of the need for military orders being a new policy that was generated, that is a complete mischaracterization of the evidence in the record, the undisputed evidence in the record. If you look at the declaration of Valerie Hicks, what happened was she was a supervisor. She became Mr. Salem's supervisor in March of 97. She had him for only four months when he ended up needing to be on disability leave. There was an overtime issue within the prison. There was a cut down of the amount of overtime that was being allowed. She goes to a superior and asks, how do I handle these overtime issues when I have a military leave request? We have to backfill behind that, and we have to dip into overtime to accomplish that. How do I balance this directive to cut down on overtime and these issues of needing backup during military leave? And the guidance she received was, make sure you have the orders. Let me ask you this. In terms of the actions after the Cal OSHA citation, there's a series of them that are set forward by Mr. Salem. Are you arguing that they did not happen, or are you arguing that there's not a connection that's been shown, or are you arguing that these are not adverse job actions and therefore not actionable? Probably a little bit of both. We're talking about four issues. We're talking about discipline that was proposed but not ever effectuated in the form of a letter of reprimand. We're talking about performance appraisals perhaps, but that happened over a continuum, so that was one of the issues I did consider. Reassignment from the specialty clinic as a result of the new union steward coming into position and bumping Mr. Salem. And the selection or non-selection for correctional counselor one positions that occurred during the statute, the period that was opened by the statute of limitation, which is in this case, August 10, 1999 to August 10, 2000. Now those four actions, I don't think the performance appraisal, the lack of one, is something that arises to the level of an adverse action as a result of the Casalter case. Perhaps the reassignment could be considered, but when you look at the context and the cause for the reassignment, which was the new union steward exercising his rights under the collective bargaining agreement to get the position that he needed to function as a union steward, the same thing that Mr. Salem did when he was a union steward, I don't think you can construe that as an adverse action. At the time the district judge ruled in this case, the Casalter case had not come down. Is that right? That's correct, Your Honor. So the argument as to what might constitute an adverse job action under a 1983 free speech claim was at least the Casalter enunciation of that standard had not been articulated. So the district judge did not have, if I can say it this way, the benefit. That's true. We did not have the opportunity to argue based on the enlightenment that that case provides. However, the court decided this case on the basis of nexus, the complete lack of it, no facts in the record showing the nexus. Although our case law, even before Casalter, in fact, our case law I think before Casalter might have been stronger in this respect, suggests that if there's a fairly short elapsed time period between the protected free speech, and here for the purposes of our argument, I'll just say the citation comes in from Osho, although that was as a result of his earlier speech, and these actions, that was a pretty short time period. That's true. But when you look at the context as a whole, since time itself or in isolation is not the ultimate determinative tool, you have to look at whether or not there was knowledge on the part of the defendants. Nowhere is there knowledge established that any of these defendants were aware of the Osho citation. Oh, my goodness. Well, and you need to look at their... And we can't ask a jury to infer knowledge within the prison of an Osho citation to the prison? It would seem that these are serious. In fact, they use the word serious on the citation. But when you look at the substance of it, there was no penalty. There was a three-day posting requirement. But you're asking as a matter of law to conclude that the people who acted here were unaware of that Osho citation. You're saying it could not reasonably be inferred that these people knew about the Osho citation? Not all of them. The Osho citation, the response to it in a document that was provided in plaintiff's excerpts that wasn't provided in the same form below, seems to indicate that it was the health services officer who responded to the Osho citation. And other than that, there is no indication of who at the prison was made aware of it. Okay. With respect to the other issues that the court would consider within the statute of limitations, there is, I think we talked about the reassignment, the performance appraisals happened both before and after the statute of limitations. Therefore, there really isn't a reasonable inference that the lack of the performance appraisal was a retaliatory act. There's just no evidence that it was. And the explanation by Valerie Hicks for her inability to provide performance appraisals has not been challenged by any factual evidence in the record. The post-abandonment, there's one point I wanted to make about the post-abandonment investigation. That actually began in April of 1999. The post-abandonment, the facts itself, happened April 20th, 1999. Plaintiff alleges various different dates in his briefing and in his declaration for the beginning of that investigation, unsupported facts. But the that investigation was initiated by Captain Scribner, not a defendant here, based on reports of individuals, not defendants here, who reported to him what had happened on that night. An inmate who had been stabbed had been left entirely alone in the clinic. That is not protocol in a prison. The investigation was initiated on the 28th of April, 1999. It was forwarded outside the institution to make sure it was objectively done. It came back, there were facts that support that plaintiff left his post and there is, so the idea that this is a pretext just is not established. The, there were others who were disciplined in connection with the investigation that resulted. Mr. Salem was not. Mr. Gilks, Dr. Gilks, the chief medical examiner, was the one who proposed the discipline and withdrew it within three days. And the process under which he withdrew it was called the Skelly hearing. It was the first opportunity that he had to hear from Mr. Salem himself about what had happened on that evening. And Mr. Gilks is either retired, he may even be deceased. We don't have any information from him. But what you can tell from looking in the This probably resulted from a lack of communication between Mr. Salem and his relief. Mr. Salem thought the relief was coming, the relief thought somebody was with the prisoner, and there was a lapse of time under which he was entirely alone. And that is something to get excited about in a prison. The non-selection for the correctional counselor one positions is another allegation within the statute of limitations that could be deemed an adverse action. The only problem is there is no connection between any of the named defendants and any of the people who had responsibility for not selecting Mr. Salem in those competitions. Every one of the panel members submitted a declaration saying that the lack of a performance appraisal in Mr. Salem's case or anyone's case was not determinative of who was selected. If you look at the declaration of Jan Thompson, she delineates all the statistics about who was the most qualified in those competitions. Salem was not high on the list. I think Judge Burrell, when he had this case with so many issues before him, some untimely, some perhaps timely, some maybe adverse actions, some not, did the best job that he could do in trying to marshal the evidence. And it was easiest, I believe, to find that there was no connection, no evidence that the protected speech, if there was any, was that he was not qualified. It was a matter of, it was a substantial motivation in any of the alleged adverse actions. You say that the military aspect only happened once in two months. That was it. That's correct, Your Honor. And it happened before the OSHA citation. Did it happen before the OSHA complaint? Yes, it did. Okay. Before any contact whatsoever. Did it happen before the, before he went to the Union? That is a little less clear because I know that Mr. Salem, from the time he assumed his position as the Union steward, was quite active in filing grievances. And that particular issue of the needles and the handling of sharps was near and dear to his heart because he had pricked himself a number of times before by doing things such as recapping a needle, which is not proper protocol to begin with. One of the instances was when an IV broke. So I'm not sure how you could have prevented that needle stick. And once was his own lack of attention when he's examining a needle and reaching for a lancet, not paying attention, triggered it again. So there may have been problems with the way the prison stored sharps and how they administered medication during the lockdown period, which is critical. When you look at the OSHA citation, it's not a global criticism of how needles are handled in this prison. It is a direction to modify policy when it can be adjusted. Plaintiff alleges that the prison was required to use safety needles. If that were the case, the citation would not say you have six months to try and implement a change and perhaps consider using safety needles. It would have said you are required to use safety needles and you're not doing it. Do it now. So I think your answer to my question as to the timing with respect to going to the Union with respect to the safety concerns about needles and the military action is that you're not sure? I'm sorry, Your Honor. I am not sure. There appeared to be a number of reasons. I can look through the record for it. Thank you. Okay. Just on a last point, I wanted to address the mini-confession that Plaintiff alleges occurred. Defendants below objected to the admission of that hearsay evidence. There was no declaration from Barbara Walters, and indeed, this oblique reference to they will be looking for you is simply, it's the only proof that Plaintiff put forward of a nexus, and it simply is not evidence. It wasn't admissible, and it is just lacking in the standard for a summary judgment. We do not have an affidavit from Ms. Walters. No, Your Honor. In terms of Plaintiff's allegation that his rights to association were interfered with, there is also nothing in the record that any of these defendants interfered with the Plaintiff's association with his union or the role he desired to play in the union. He, in fact, left his union membership for his own reasons, as he said in his deposition, and so that association claim was, for the first time, made clear to me here today. Before that, I struggled to find out what it really was based on the record we have in this case. In conclusion, I'd like to urge this Court to truly look at the record and to decide this case based on the facts that are presented there and the facts that only claim to be there through Plaintiff's pleadings and argument. And I think that the Court will find that in this case, there simply hasn't been enough to establish a violation of Section 1983, nor has there been an allegation under the USERRA. Thank you, Your Honor. Thank you for your argument, counsel. Rebuttal. Thank you. The beginning of this was early 1998 was when the union grievance process started. But by May, and that took its course where there was actually a grievance granted at last, but it happens early 1998. And then his OSHA attempts go on in 1999, and they start about May 1999. And I have as a reference for that the Declaration of Mr. Salem at paragraphs 4 and 5. And let's see. Actually, I'm sorry, paragraph 13. There's an Exhibit A that references that as well. And what page is that on the record? Let's see. Declaration of – it's in my brief at page 13, but the reference – that's where the reference is. But it's Declaration of Salem, paragraph 13. And that gives you the start date of the – And what page is that on the record? I'm on page 13 and 14 of my opening brief. Not in that – actually, those are – what you have in front of you is a – that's not the full transcript. That's something supplied by the Attorney General's office. I see. So it's in a separate –  Not in that one you have. But anyway, he explains that – in May to December of 99 is when he was going to Cal OSHA. There's a whole process where you submit a complaint. They review it. They investigate it. And then it culminated in December 99 where it was handed to the warden. So the warden certainly knew it. It was given right to him. And this whole problem of military leave is going on throughout all that. Well, you said it only happened once during a period of two months. Right. And that was after – what I want to point out is that was definitely after the union grievance process, the problem she was referencing right there. Is that true? The only once during a period of two months? No. What they are saying is, hey, you only missed one time. And that's what they're kind of glomming on to. And what they're minimizing is the fact that they, in this retaliatory method, forced him to stay up until midnight. And he just went ahead and went anyway. He didn't actually miss a day. Except once. Except once. He just suffered through it, in effect. And we're saying they don't have that right to interfere with that and make it so difficult. And they're trying to minimize that. Also about the Kyle Osha site, you can read it. They just flagrantly violated the law on that. And even with the union grievance sustained, they just wouldn't obey the law. And the good news is, alas, they did. I was very sad to hear the Attorney General's Office minimizing the conduct involved there, because it's a very serious problem. And you have to probably be in the shoes of an MTA and get pricked by one of these needles to really feel for it. It was not a small thing at all. And it did. The good news is it fixed the problem at last. Okay. We're out of time. Thank both sides for their arguments. They're quite helpful. The case just argued will be submitted for decision. And the Court's going to stand and recess for about five to ten minutes if counsel on PG&E can come forward and get set up.
judges: Hawkins, W.fletcher, King